**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

JOHANA GARCIA,
*on behalf of herself and others similarly situated*,

                Plaintiff,

                  v.

ATKINS NUTRITIONALS, INC.,

                Defendant.

_____

Case No.:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff JOHANA GARCIA, individually and on behalf of all other persons similarly situated in New York and the United States, by her undersigned attorneys, pursuant to this Class Action Complaint against the Defendant, ATKINS NUTRITIONALS, INC, alleges the following:

## <u>NATURE OF THE ACTION</u>

    1.    Plaintiff JOHANA GARCIA (herein, "Plaintiff GARCIA" or "Plaintiff"), on behalf of herself and others similarly situated, by and through her undersigned attorneys, brings this class action against Defendant, ATKINS NUTRITIONALS, INC. (herein, "Atkins" or "Defendant"), for the deceptive practice of marketing its food products with "Net Carbs" claims in order to mislead consumers about those products' impact on blood sugar levels.

2.    Defendant's "Net Carbs" claims figure prominently on the front labels of its various "meal bars," "snack bars," and "treats."  Here is one representative example:



3.    These Net Carbs claims are intended to communicate to consumers that the dietary fiber and "sugar alcohols" (synthetic substances that combine the chemical properties of both sugar and alcohol) in its products should not be counted as carbohydrates because they have a "minimal" or "negligible" effect on blood sugar levels.   Defendant's website provides the following explanation for "How are Net Carbs Calculated?":

In order to calculate Net Carbs of any whole food item, it's a simple calculation based on the Nutrition Facts panel:

Total Carbohydrates - (Minus) Dietary Fiber = (Equals) Net Carbs

For low carb products sweetened with sugar alcohols (ie: glycerin, maltitol, etc), refer to the Nutrition Facts panel of the product:

Total Carbohydrates - (Minus) Dietary Fiber - (Minus) Sugar alcohol = Net carbs

This reflects the fact that Dietary Fiber doesn't impact blood sugar levels. Sugar alcohols also have a negligible impact on blood sugar, they too are subtracted from total carbs to yield the Net Carb count.[1]

4.      Similar representations are located on the back labels of products accompanied by

Net Carb representations.  Here is an example from the Atkins® Chocolate Peanut Butter Pretzel

Bar:



5.      Defendant makes the same claims where Net Carbs products are sold online.  Here is

the text accompanying the Atkins® *Endulge*® Peanut Butter Cups on Amazon.com:

The Atkins Diet is based on delicious low-carb recipes and whole foods. If youre short on time, Atkins provides meal, snack and treat bars and shakes to keep you satisfied, even when you are on the go. Counting Carbs? The Net Carb Count helps you count carbs that impact blood sugar. Fiber, sugar alcohols, including glycerin, should be subtracted from the total carbs since they minimally impact blood sugar. Find out more details about the diet, and Atkins Bars and Shakes by visiting atkins.com. This product can be used in following phases of the Atkins Diet. Phases: 2 3 4 What can Atkins Bars do for you?Advantage Meal Great as a satisfying meal, or can be used as a super-filling snack.Advantage Snack A filling snack or a light meal helps fight off hunger between meals and on the run.Day Break Snack A filling morning snack or light breakfast helps fight hunger in

_____

[1] https://www.atkins.com/products/bars/meals/peanut-butter-granola-bar

between meals and on the run.Endulge Treats When cravings strike, reach for a treat or dessert without the added sugar. [emphasis added][2]

6.    Defendant's claims are false, deceptive, and unlawful, however, because two of Defendant's most frequently used sugar alcohols, maltitol and maltitol syrup, have a significant effect on blood sugar levels.  On Defendant's own theory, carbohydrates derived from them should not be subtracted from the "Total Carbohydrates" in determining the "Net Carbs" count.

7.    Defendant sold Plaintiff and Class members, and continues to sell consumers, the following products that contain maltitol and/or maltitol syrup and have misleading "Net Carbs" language:

**Atkins® Meal Bars**
   a.  Chocolate Chip Cookie Dough Bar
   b.  Chocolate Peanut Butter Bar
   c.  Chocolate Peanut Butter Pretzel bar
   d.  Cookies n' Crème Bar
   e.  Mudslide Bar
   f.  Peanut Butter Granola Bar

**Atkins® Snack Bars**
   a.  Classic Trail Mix
   b.  Sweet & Salty Trail Mix
   c.  Caramel Chocolate Nut Roll
   d.  Caramel Chocolate Peanut Nougat Bar
   e.  Caramel Double Chocolate Crunch Bar
   f.  Cashew Trail Mix Bar
   g.  Coconut Almond Delight Bar
   h.  Dark Chocolate Almond Coconut Crunch Bar
   i.  Dark Chocolate Decadence Bar
   j.  Triple Chocolate Bar
   k.  Chocolate Chip Crisp Bar
   l.  Chocolate Hazelnut Bar
   m.  Chocolate Oatmeal Fiber Bar

---

[2] https://www.amazon.com/Atkins-Endulge-Peanut-Butter-Count/dp/B001OHV1GU/ref=sr_1_1_s_it?s=grocery&ie=UTF8&qid=1498750847&sr=1-1&keywords=atkins%2Bendulge%2Bpeanut%2Bbutter%2Bcups&th=1 (last accessed 07/10/17).

**Atkins® *Endulge*® Treats**
   a.   Dark Chocolate Raspberry Squares
   b.   Dark Chocolate Fudge Squares
   c.   Caramel Nut Chew Bar
   d.   Chocolate Candies
   e.   Chocolate Caramel Mousse Bar
   f.   Chocolate Coconut Bar
   g.   Chocolate Covered Almonds
   h.   Chocolate Peanut Candies
   i.   Milk Chocolate Caramel Squares
   j.   Nutty Fudge Brownie
   k.   Pecan Caramel Clusters
   l.   Peanut Butter Cups
   m.   Peanut Caramel Cluster Bar

Collectively, these are the "Products," which also includes any other Atkins® product that contains maltitol and/or maltitol syrup and makes "Net Carbs" representations. Such Products are detailed under **EXHIBIT A.**

8.     Defendant engaged in deceptive labeling practices by using "Net Carbs" language to mislead consumers about the actual glycemic effect of the Products (their impact on blood sugar) Defendant's Net Carbs representations communicate to consumers that the glycemic effect of maltitol- and maltitol syrup-derived carbohydrates is negligible. But the indisputable scientific truth is that it is not negligible and that the glycemic index of maltitol and maltitol syrup is closer to that of table sugar (sucrose) than it is to zero.

9.     By marketing the Products as being low in Net Carbs, Defendant misled Plaintiff and the Class about the glycemic effect of the Products, wrongfully capitalizing on, and reaping enormous profits from, many consumers' strong preference for food products that have minimal carbohydrates or minimal glycemic effect.

10.     For example, the Atkins® *Endulge*® Peanut Butter Cups purchased by Plaintiff, *see* **Exhibit A**, pp. 61-62, lists 18 grams of carbohydrates in the nutrition panel, of which 4 grams are dietary fiber and 12 grams are sugar alcohols. So, Defendant represents that the Peanut Butter

Cups have "2g Net Carbs" on the theory that the carbohydrates derived from dietary fiber or sugar alcohols do not raise blood sugar and hence do not qualify as carbohydrates for purposes of maintaining a lower blood sugar level.

11.    While this is true of dietary fiber and <u>some</u> sugar alcohols, it is not true of the sugar alcohol maltitol, which figures prominently at the very top of the Peanut Butter Cups' ingredients list and accounts for all of the sugar alcohols in the Product.

12.    The quantity of sugar alcohols varies between different Products.  And some of these also contain other sugar alcohols <u>in addition</u> to maltitol and/or maltitol syrup.  But irrespective of these variations, it remains a deceptive practice to subtract any maltitol—or maltitol syrup— derived carbohydrates from the total carbohydrate count in calculating Net Carbs.

13.    Plaintiff does not allege that Defendant's general carbohydrate-conscious nutritional philosophy (as explained in ¶¶ 28-35 below) is deceptive.  Plaintiff also does not allege that all "Net Carbs" claims are inherently deceptive.  However, Plaintiff does allege that the particular Net Carbs calculations for the Products are deceptive and unlawful because they discount sugar alcohols that do raise blood sugar levels.

14.    Plaintiff bring this proposed consumer class action on behalf of herself and all other persons nationwide, who, from the applicable limitations period up to and including the present ("Class Period"), purchased any of the Products for consumption and not for resale.

15.    Defendant violated statutes enacted in each of the fifty states and the District of Columbia that are designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. These statutes are:

    *1)*  Alabama Deceptive Trade Practices Act, Ala. Statues Ann. §§ 8-19-1, *et seq.;*
    *2)*  Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.;*
    *3)*  Arizona Consumer Fraud Act, Arizona Revised Statutes, §§ 44-1521, *et seq.;*
    *4)*  Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.;*

5) California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.;*

6) Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.;*

7) Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.;*

8) Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.;*

9) District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.;*

10) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.;*

11) Georgia Fair Business Practices Act, § 10-1-390 *et seq.;*

12) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.;*

13) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.;*

14) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.;*

15) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. §§ 24-5-0.5-0.1, *et seq.;*

16) Iowa Consumer Fraud Act, Iowa Code §§ 714.16, *et seq.;*

17) Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.;*

18) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.;*

19) Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § § 51:1401, *et seq.;*

20) Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq,,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.,*

21) Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.;*

22) Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

23) Michigan Consumer Protection Act, § § 445.901, *et seq.;*

24) Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.;* and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.;*

25) Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.;*

26) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.;*

27) Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.;*

28) Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.;*

29) Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.;*

30) New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq. ;*

31) New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 *1, et seq.;*

32) New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 *1, et seq.;*

33) New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.;*

34) North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.;*

35) North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §§ 75-1, *et seq.;*

36) Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01. *et seq.;*

37) Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.;*

38) Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.;*

39) Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § § 201-1, *et seq.;*

40) Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.;*

41) South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.;*

42) South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 *1, et seq.;*

43) Tennessee Trade Practices Act, Tennessee Code Annotated §§ 47-25-101, *et seq.;*

*44)* Texas Stat. Ann. §§ 17.41, *et seq.,* Texas Deceptive Trade Practices Act, *et seq.;*
*45)* Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.;*
*46)* Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.;*
*47)* Virginia Consumer Protection Act, Virginia Code Ann. §§59.1-196, *et seq.;*
*48)* Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.;*
*49)* West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.;*
*50)* Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100. 18, *et seq.;*
*51)* Wyoming Consumer Protection Act, Wyoming Stat. Ann. §§40-12-101, *et seq.*

## JURISDICTION AND VENUE

16.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

17.    The Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

18.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendant, pursuant to New York Statute N.Y. CVP. Law § 302, because it conducts substantial business in this District.  Some of the actions giving rise to the Complaint took place in this District, and Plaintiff's claims arise out of Defendant operating, conducting, engaging in or carrying on a business or business venture in this state or having an office or agency in this state; committing a tortious act in this state; and causing injury to person or property in this state arising out of Defendant's acts and omissions outside this state. Additionally, this court has personal jurisdiction over Defendant because its Products are advertised, marketed, distributed, and sold throughout New York State; Defendant engaged in the wrongdoing alleged in this Complaint throughout the United States, including in New York State; and Defendant has sufficient minimum contacts with New York and/or has intentionally availed itself of the markets in New York State, rendering the exercise of jurisdiction

8

by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial and not isolated activity within New York State.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendant has caused harm to class members residing in this District, and the Defendant is a resident of this District under 28 U.S.C. 1391(c)(2) because it is subject to personal jurisdiction in this district.

## PARTIES

*Plaintiff*

20.    Plaintiff GARCIA is, and at all times relevant hereto has been, a citizen of the State of New York. Plaintiff GARCIA resides in Bronx County. On April 9, 2017, Plaintiff GARCIA purchased a 5-count box of Atkins® *Endulge*® Peanut Butter Cups for $12.08 through Amazon.com for personal consumption within the State of New York.

21.    Plaintiff GARCIA was exposed to Defendant's claims that sugar alcohols should be subtracted from total carbohydrates because they only minimally impact blood sugar levels both through Defendant's website and through representations on Amazon.com.

22.    She did not know, and had no reason to know, that these claims are false as to maltitol. She would not have purchased the Peanut Butter Cups had she been aware of the truth about them.

23.    Plaintiff GARCIA was financially injured when Defendant deprived her of the benefit of her bargain by delivering a product that had less value than Defendant had warranted.

24.    Should Plaintiff GARCIA encounter the Products in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging. However, Plaintiff GARCIA would still be willing to purchase the current formulation of the Products, absent the price premium, so long as Defendant engages in corrective advertising.

*Defendant*

25.    Defendant ATKINS NUTRITIONALS, INC. is a corporation organized under the laws of New York with its headquarters at 1050 17th Street, Suite 1500, Denver, CO 80265.  Its address for service of process is C/O Corporation Service Company, 80 State Street, Albany, NY 12207-2543.

26.    Defendant develops, markets and sells its extensive line of energy bars, snack food, frozen meal, and shake products under the "ATKINS®" brand name throughout the United States, through numerous retail and online outlets such as Target, Duane Reade, CVS, Rite Aid, and Amazon.com.

27.    The advertising for the Products, relied upon by Plaintiff, was prepared and/or approved by Defendant and its agents, and was disseminated by Defendant and its agents.  The advertising for the Products was designed to encourage consumers to purchase the Products and reasonably misled the reasonable consumer, i.e. Plaintiff and the Class, into purchasing the Products. Defendant owns, manufactures and distributes the Products, and created and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive labeling and advertising for the Products.

## FACTUAL ALLEGATIONS

### The Atkins Diet: From Calorie Counting to Carb Counting

28.    The founder of Atkins Nutritionals, Dr. Robert Coleman Atkins, was an early pioneer of the low-carbohydrate approach to dieting before it became popular and accepted by an increasing number of medical professionals and researchers.  Traditional dieting approaches focused on limiting calories and fat.  Since weight gain was believed to be the result of consuming more calories than one expends, the key to weight loss was calorie reduction.  And since fat is a

high-caloric nutrient, calorie-reduction could be achieved by minimizing fat (which was also considered unhealthy for other reasons).

29.    But Dr. Atkins believed that the true villain is an excess of unhealthy carbohydrates. While not all carbohydrates are sugars, most carbohydrates are "glycemic" in that they turn into sugar upon entering the bloodstream and from there are turned into fat, causing weight gain and other health problems.  Defendant's website explains:

> "Glycemic" simply means "relating to sugar." The higher the glycemic impact of a food (more about this below), the greater and more rapid its effect on your blood sugar when you eat it—and the more insulin required to return your blood sugar to normal. Since insulin is a fat-storage hormone and since overweight people often already produce too much of it, high blood sugar and high insulin can sabotage your weight-management and better health efforts. Eating lower glycemic foods is definitely the way to go.[3]

30.    Dr. Atkins considered traditional calorie-counting diets inadequate because they ignored that different kinds of calories had different levels of glycemic impact.[4]  Whereas calories from healthy fats can be readily used by the body for energy, calories from high-glycemic carbohydrates will quickly turn into fat.  They therefore become unavailable for use, causing the individual to become hungry again quickly and eat prematurely.  Thus, the Atkins approach seeks to regulate caloric intake indirectly, by regulating metabolism and appetite so that dieters will not feel impelled to eat excessively.

31.    While Dr. Atkins was the first widely-known diet doctor to promote the low-carb approach, a number of other low-carb diets have since sprung up, including The Zone, Paleo, South Beach, Ketogenic, and others.  While these diets' advocates do not agree with the Atkins approach on every particular, these various diets all form part of a general shift away from fat-counting and

---

[3] https://www.atkins.com/how-it-works/library/articles/the-low-glycemic-approach-to-healthy-eating (last accessed 06/12/17).
[4] https://www.atkins.com/how-it-works/library/articles/compare-weight-loss-programs (last accessed 06/12/17).

calorie-counting (the "calories in/calories out" approach to weight loss) toward carb-counting. Many consumers who may not identify as official adherents of any particular dieting philosophy have nevertheless been influenced by this trend and accordingly seek to minimize or restrict their intake of carbohydrates.[5]  An experimental study by the FDA that exposed participants to various food products with carbohydrate-related claims found:

> Respondents who saw only the *front panel* with a claim that implied "low in carbohydrate," such as "Low Carb," "CarbConscious," or "1g Net Carb," perceived the product to be lower in carbohydrate and more helpful for weight management than those who saw the same product without a "low in carbohydrate" claim.[6]

32.    Traditional dieting approaches distinguish between "simple carbohydrates" like sugar and white flour and "complex carbohydrates" like fruits, potatoes, and whole grains.  But Dr. Atkins believed that this distinction failed to capture that actual effects of different carbohydrates on people's blood sugar (or "blood glucose") levels.[7]  The Atkins approach instead endorses the "glycemic index" as a "better gauge of the impact of various carbohydrates on your blood sugar."  Dieters should therefore "pay closer attention not only to the amount of carbohydrates consumed, but also to their position on the glycemic index."[8]

33.    As explained by Atkins, the glycemic index (or "GI") measures "the relative impact of carbohydrate foods on blood sugar. The GI of a particular food is determined by comparing the effect of a 50-gram portion on blood sugar to that of a 50-gram standard such as a glucose solution

---

[5] *See* https://authoritynutrition.com/6-reasons-to-stop-calling-low-carb-a-fad/ (last accessed 06/12/17); http://www.naturalproductsinsider.com/articles/2004/03/low-carb-diet-not-a-passing-fad.aspx (last accessed 06/12/17).
[6] http://www.fda.gov/food/foodscienceresearch/consumerbehaviorresearch/ucm168989.htm (last accessed 06/12/17).
[7] https://www.atkins.com/how-it-works/library/articles/the-importance-of-the-low-glycemic-impact-part-2 (last accessed 06/12/17).
[8] https://www.atkins.com/how-it-works/library/articles/the-importance-of-the-low-glycemic-impact-part-2 (last accessed 06/12/17).

or white bread. The higher a food's GI, the faster and greater its effect on your blood sugar."[9] Thus, glucose—the kind of sugar that enters the blood stream—is normalized to 100, and the glycemic index of other foods indicates how glycemic they are by comparison with this. For example, sucrose, or table sugar, has a glycemic index of 63,[10] while a frozen white bagel has a glycemic index of 72.[11] A low-glycemic grain like pearled barley has a glycemic index of 25 while standard cheese pizza has a glycemic index of 70.[12]

34.    A food's position on the glycemic index is not the only relevant measure of its glycemic impact, however, because the glycemic index is tied to a standard 50-gram portion and thus does not take a food's usual serving size into account. A publication of Harvard Medical School explains:

> But the glycemic index tells only part of the story. What it doesn't tell you is how high your blood sugar could go when you actually eat the food, which is partly determined by how much carbohydrate is in an individual serving. To understand a food's complete effect on blood sugar, you need to know both how quickly the food makes glucose enter the bloodstream, and how much glucose it will deliver. A separate value called glycemic load does that. It gives a more accurate picture of a food's real-life impact on blood sugar. The glycemic load is determined by multiplying the grams of a carbohydrate in a serving by the glycemic index, then dividing by 100. A glycemic load of 10 or below is considered low; 20 or above is considered high. Watermelon, for example, has a high glycemic index (80). But a

---

[9] https://www.atkins.com/how-it-works/library/articles/the-low-glycemic-approach-to-healthy-eating (last accessed 06/12/17).

[10] http://lpi.oregonstate.edu/mic/food-beverages/glycemic-index-glycemic-load (last viewed 06/12/17)

[11] http://www.health.harvard.edu/diseases-and-conditions/glycemic_index_and_glycemic_load_for_100_foods (last accessed 06/12/17).

[12] http://www.health.harvard.edu/diseases-and-conditions/glycemic_index_and_glycemic_load_for_100_foods (last accessed 06/12/17).

serving of watermelon has so little carbohydrate (6 grams) that its glycemic load is only 5.13

35.    The Atkins diet endorses the glycemic load (or "GL") as an "improve[ment] on the measuring process of the GI.  Because it takes portion size into account, it gives a more accurate reading."[14]

**The Net Carbs Concept: "All Carbs Are Not Created Equal"**

36.    In addition to stating their total carbohydrate content as required by FDA regulations, Atkins food products prominently display what Defendant calls their "Net Carbs" or "Atkins Net Carbs," which are invariably lower than the actual carbohydrate count listed inside the nutrition panel.  For example, the Atkins *Endulge*® Caramel Nut Chew Bar box lists "2g Net Carbs" on the front and provides the following equation on the back: 17g (Total Carbs) – 6g (Fiber) – 9g (Sugar Alcohols) = 2g (Atkins Net Carbs).  The back of the box also explains the equation as follows: "**Counting Carbs?**  Atkins Net Carb Count assists you in tracking carbs that impact blood sugar. Fiber and sugar alcohols should be subtracted from the total carbs since they minimally impact blood sugar."

37.    Immediately below is a table documenting the Net Carbs calculations on a sampling of the Products:

---

[13] http://www.health.harvard.edu/diseases-and-conditions/glycemic_index_and_glycemic_load_for_100_foods (last accessed 06/12/17).
[14] https://www.atkins.com/how-it-works/library/articles/the-low-glycemic-approach-to-healthy-eating (last accessed 06/12/17).

| PRODUCT | TOTAL CARBS | GRAMS OF FIBER | GRAMS OF SUGAR ALCOHOLS | "NET CARBS" |
|---|---|---|---|---|
| Atkins® *Endulge*® Peanut Caramel Cluster Bar | 13 | 6 | 4 | 3 |
| Atkins® *Endulge*® Chocolate Caramel  Mouse Bar | 23 | 9 | 12 | 2 |
| Atkins® *Endulge*® Peanut Butter Cups | 18 | 4 | 12 | 2 |
| Atkins® *Endulge*® Chocolate Peanut Candies | 18 | 2 | 15 | 1 |
| Atkins® *Endulge*® Caramel Nut Chew Bar | 17 | 6 | 9 | 2 |
| Atkins® Caramel Chocolate Nut Roll | 19 | 6 | 10 | 3 |
| Atkins® Chocolate Peanut Butter Pretzel Bar | 19 | 6 | 10 | 3 |
| Atkins® Peanut Butter Granola Bar | 19 | 6 | 10 | 3 |

38.    Defendant's website elaborates upon the Net Carbs Concept, telling consumers that

"All Carbs Are Not Created Equal." Some carbohydrates like dietary fiber "pass through your

body without having any impact on blood-sugar levels" and others, like sugar alcohols "have a

minimal impact on blood-sugar levels."[15]  Providing "The Scoop on Sugar Alcohols," Defendant's website explains:

> Many low-carb products are sweetened with a form of sugar called sugar alcohols. Sugar alcohols come in the form of ingredients such as glycerin, mannitol, sorbitol, xylitol, erythritol, isomalt, lactitol and maltitol. Sugar alcohols provide a sweetness and mouth feel similar to sugar, without all the calories and unwanted metabolic effects. Sugar alcohols are not fully absorbed by the gut, which means they provide roughly half the calories that sugar does. Thanks to this incomplete and slower absorption, there is a minimal impact on blood sugar and insulin response. Because of this, sugar alcohols don't significantly interfere with fat burning, which makes them acceptable on Atkins. However, since a portion of sugar alcohols aren't fully absorbed in the gut, there is the potential that consuming too much may produce a laxative effect or cause some gastrointestinal problems. Most people can usually handle 20 to 30 grams a day. To calculate Net Carb count with sugar alcohols, simply subtract grams of sugar alcohols (including glycerin), as well as fiber, from total grams of carbs.[16]

39.    Thus, the Net Carbs in an Atkins product are intended to represent the number of grams of carbohydrates that will actually impact a person's blood sugar level.  Since this is why followers of Atkins and other low-carb diets try to restrict their carbohydrate intake in the first place, they need only pay attention to those carbohydrates which have this undesired effect—that is, glycemic carbs.

**The Net Carbs Deception: "All Sugar Alcohols Are Not Created Equal"**

40.    Most nutritionists, physicians, and researchers will agree with Atkins that dietary fiber is not digested and therefore has a minimal or non-existent impact on blood sugar levels.  However, Atkins has engaged in a systematic campaign to deceive carb-conscious and carb-counting consumers that the same holds true of all sugar alcohols when the glycemic index of

---

[15] https://www.atkins.com/how-it-works/library/articles/how-to-read-a-food-label (last viewed 06/12/17)

[16] https://www.atkins.com/how-it-works/library/articles/ask-the-nutritionist-the-scoop-on-sugar-alcohols (last viewed 06/12/17)

some sugar alcohols is far from negligible. Below is a list of the most common sugar alcohols and their glycemic index, compiled by nutrition researcher Geoffrey Livesy:

| Glycemic Index and Energy Values of Polyols | | |
|---|---|---|
| Polyol | GI (glucose=100) | Calories/g |
| Maltitol syrup (intermediate) | 53 | 3 |
| Maltitol syrup (regular) | 52 | 3 |
| Maltitol syrup (high) | 48 | 3 |
| Polyglycitol (hydrogenated starch hydrolysate) | 39 | 2.8 |
| Maltitol syrup (high-polymer) | 36 | 3 |
| Maltitol | 36 | 2.7 |
| Xylitol | 13 | 3 |
| Isomalt | 9 | 2.1 |
| Sorbitol | 9 | 2.5 |
| Lactitol | 6 | 2 |
| Erythritol | 0 | 0.2 |
| Mannitol | 0 | 1.5 |

Geoffrey Livesey, "Health potential of polyols as sugar replacers, with emphasis on low glycemic properties," in *Nutrition Research Reviews* 2003; 16: 163-91, pp. 179, 180.

41.    Atkins tells consumers that "Carbs Are Not All Created Equal." But it fails to disclose to them that likewise "Sugar Alcohols Are Not All Created Equal." While the glycemic index of *some* sugar alcohols is indeed quite low or even non-existent, this is not at all true of

maltitol, GI=36, and maltitol syrup, GI= 36-53 depending on the kind.  Maltitol and maltitol syrup are both used extensively in a variety of Atkins products, figuring quite high in the ingredient lists of many.

42.    To put this into perspective, the glycemic impact of a gram of maltitol is 57% that of a gram of sucrose or table sugar (GI=63) while the glycemic impact of a gram of maltitol syrup may be up to 84% that of table sugar.  The glycemic index of maltitol syrup can be higher than sponge cake (GI=46), corn tortilla (GI=52), baked beans (GI=40), and macaroni (GI=50) and almost as high as a hamburger bun (GI=61) and Coca-Cola (GI=63).  The glycemic index of maltitol is higher than barley bread (GI=34), wheat tortilla (GI=30), and black beans (GI=30) and almost as high as navy beans (GI=39) and whole-grain spaghetti (GI=42).[17]

43.    Thus, while the glycemic index of maltitol and maltitol syrup may be lower than that table sugar and certain other foods, it is hardly "minimal" or "negligible," as Atkins claims.  The difference between these sugar alcohols and what reasonable consumers recognize to be a highly glycemic carbohydrate like ordinary table sugar is not vast.

44.    Discounting maltitol and maltitol syrup carbs from the "Net Carbs" count right along with the fiber carbs suggests to the reasonable consumer that the glycemic effect of these sugar alcohols is approximately that of fiber—which is to say, zero.  But the truth is that their glycemic index is closer to that of table sugar than it is to fiber (*much* closer when it comes to maltitol syrup).  The first phase of the original Atkins diet—now renamed the "Atkins 20 Diet Plan"—prohibits a

---

[17] http://www.health.harvard.edu/diseases-and-conditions/glycemic_index_and_glycemic_load_for_100_foods (last accessed 06/12/17).

number of foods whose glycemic index is *lower* than maltitol and/or maltitol syrup,[18] including whole milk (GI=31),[19] legumes (GI between 13 and 50),[20] and cherries (GI=22).[21]

45.    The inconsistency is readily explained by Atkins's desire to sell as many allegedly low-carb snack products as possible and its willingness to deceive the public in order to achieve this goal.  Someone on Phase 1 of the Atkins 20 is permitted 20-25g of Net Carbs daily,[22] which would allow that person to consume upward of 12 "2 Net Carbs" *Endulge*® Caramel Nut Chew Bars daily and remain within the diet.  But this is only because the 9g of carbohydrates from maltitol and maltitol syrup in the product have been discounted from the Net Carb count along with the fiber.  Include those carbohydrates and the Net Carbs count jumps to 11g, meaning that the same person could consume at most 2 Chew Bars daily and remain within the diet.  Not every carb-conscious consumer is an official follower of the Atkins diet or strictly adheres to a pre-set daily carbohydrate limit.  But all seek to limit or minimize carb-intake when possible or convenient, and will accordingly be much more willing to purchase a 2g Net Carbs product than an 11g Net Carbs product.

**The Judgment of Experts**

46.    What any layperson can infer from the chart above is confirmed by the testimony of many nutritionists, physicians, researchers, and other health professionals:

> Some food companies started using the term "net carbs" and defined it to mean the total grams of carbohydrate minus the grams of sugar alcohols, fiber, and glycerine.

---

[18] https://www.atkins.com/how-it-works/atkins-20 (last viewed 06/12/17)

[19] http://www.health.harvard.edu/diseases-and-conditions/glycemic_index_and_glycemic_load_for_100_foods (last viewed 06/12/17)

[20] http://www.health.harvard.edu/diseases-and-conditions/glycemic_index_and_glycemic_load_for_100_foods (last viewed 06/12/17)

[21] http://www.livestrong.com/article/427337-the-glycemic-index-of-cherries/ (last viewed 06/12/17)

[22] https://www.atkins.com/how-it-works/atkins-20 (last viewed 06/12/17)

>This equation is not entirely accurate, because some of the sugar alcohols and fiber are absorbed by the body. In fact, about half of the grams of sugar alcohols are metabolized to glucose.

Madelyn L. Wheeler, MS, RD, CDE, FADA, CD, Health Professional and Winner of American Diabetes Association's Outstanding Educator in Diabetes Award [23]

>These terms have been made up by food companies.  It's a way for the manufacturers of these products to draw attention to them and make them look appealing by saying, 'Look, you can eat all these carbs, but you're really not impacting your health, so to speak.'  There are some sugar alcohols that can raise your blood sugar. Certain sugar alcohols do have a higher glycemic index, and they still are not counted as carbohydrates by these companies.

Dr. Wahida Karmally, DrPH, Director of Nutrition, Irving Center for Clinical Research, Columbia University[24]

>As far as sugar alcohols go, most of them are very low GI (ranging between 1-12), aside from maltitol at 35 GI. They still elicit a blood glucose response – but are not counted as a carbohydrate source on many labels.

Dr. John Rusin, Physical Therapist and Writer[25]

>Dr. Atkins and the vendors of low-carb products are correct that not only fiber but also glycerin and polydextrose have little or no effect on blood glucose.  The story with sugar alcohols, however, is different.  One of the most commonly used sugar alcohols, maltitol and its syrups, does have a considerable effect on blood glucose.  Two sugar alcohols, erythritol and mannitol, have no effect, and four others have some effect.

David Mendosa, Medical Writer and Diabetes Consultant[26]

>[S]ubtracting 100% of the sugar alcohol from "net carbs" is misleading to [Atkins] customers as about half of the maltitol is absorbed.

Dr. Andreas Eenfeldt, M.D., Physician and Low Carb Advocate [27]

>Some Nutrition Facts labels may also list sugar alcohols under total carbohydrate. Sugar alcohols may be found in products that are labeled "sugar-free" or "no sugar added." This can include sugar-free candies, chocolate, and energy bars. But don't be fooled – sugar alcohols are still a form of carbohydrate, and they still affect your blood sugar levels, if not as dramatically. Because sugar alcohols are hard for the body to digest, the effect on blood sugar levels is less than standard sugar. When counting carbohydrates for products made with sugar alcohols, subtract **half** of the

---

[23] http://www.diabetesforecast.org/2010/aug/what-are-net-carbs.html (last viewed 06/12/17)
[24] http://www.webmd.com/women/features/net-carb-debate#1 (last viewed 06/12/17)
[25] https://drjohnrusin.com/the-truth-about-net-carbohydrates/ (last viewed 06/12/17)
[26] http://www.mendosa.com/netcarbs.htm (last viewed 06/12/17)
[27] http://www.dietdoctor.com/atkins-greed-and-the-fairy-tale-cookies (last viewed 06/12/17)

grams of sugar alcohol listed on the food label from the total grams of carbohydrate. [emphasis added]

Diabetes Teaching Center at the University of California, San Francisco[28]

> This is the general concept that is now being applied – but with a twist – to the new food labels with "net carbs" or "zero carbs that count." The main concern with these new food labels is that the subtraction process has been generalized to all fiber grams and all sugar alcohols. However, eating sugar alcohols can cause blood sugar to rise.

Department of Human Nutrition, Kansas State University29

> Dr. David Ludwig, director of the obesity program at Children's Hospital in Boston, said that some sugar alcohols affect blood sugar levels as much as "net" carbs do. "It's unclear whether the term has any nutritional significance," he said.

*The New York Times*[30]

47. The judgment of experts is confirmed by peer-reviewed scientific journals. Surveying a wide range of studies on the glycemic impact of sugar alcohols in the *Canadian Journal of Diabetes*, Dr. Thomas M.S. Wolever of the University of Toronto and his colleagues make the following observations:

> "[T]he glucose of moiety of maltitol is absorbed and provides carbohydrates to the body for metabolism.  In a study conducted by Felber and colleagues, carbohydrate oxidation increased and lipid oxidation decreased after normal subjects consumed 30 g of maltitol, although the magnitude of these effects was smaller than that observed after consumption of 30 g of sucrose [citation omitted]"[31]

> "The glycemic response after maltitol administration was approximately 25% of that observed after administration of an equal amount of glucose [citation omitted] and 55% of that after an equal amount of sucrose [citation omitted]"[32]

---

[28] https://dtc.ucsf.edu/living-with-diabetes/diet-and-nutrition/understanding-carbohydrates/counting-carbohydrates/learning-to-read-labels/counting-sugar-alcohols/ (last viewed 06/12/17)

[29] https://www.ksre.k-state.edu/humannutrition/nutrition-topics/eatingwell-diabetes/diabetes-documents/Net_Carbs.pdf (last viewed 06/12/17)

[30] http://www.nytimes.com/2004/12/05/business/yourmoney/is-the-lowcarb-boom-over.html (last viewed 06/12/17)

[31] Thomas M.S. Wolever MD, PhD, Ana Piekarz RD, Marjorie Hollands MSC RD CDE, Katherine Younker MBA RD CDE, *Canadian Journal of Diabetes*, 2002; 26(4): 356-362, pg. 357.

[32] Ibid., pgs. 357-58.

"[R]esearch suggests that the glycemic effect of sugar alcohols depends on the type of sugar alcohol and on the nature of the food into which it is incorporated. Sorbitol, lactitol and xylitol do not raise PG [citations omitted]; however, maltitol and HSHs have demonstrated a modest effect on PG [citations omitted]. In fact, chocolate sweetened with maltitol elicited the same PG response in normal subjects as did chocolate sweetened with sucrose [citation omitted]."[33]

48.    The verdict is clear: While the glycemic effect of maltitol may be lower than that of some other carbohydrates, including table sugar (sucrose), it is far from "minimal" as Atkins claims. Indeed, the glycemic effect of maltitol is over half that of table sugar and is actually equal to it when used to sweeten chocolate (as Atkins does in many of its products). Crucially, the research cited by Dr. Wolever was conducted on **_normal_** subjects—not diabetics with a heightened susceptibility to unhealthy blood sugar fluctuations. Moreover, the research cited was examining only maltitol, not maltitol syrup, whose glycemic index may be considerably higher than maltitol's. Dr. Wolever is on record stating that "it's a big misconception to say maltitol does not raise blood sugar."[34]

49.    Dr. Wolever was at one point _retained by Atkins as an expert consultant_.[35] So Defendant is well aware of the truth about maltitol, proving that its fraud on carb-conscious consumers is knowing and willful.

50.    Not only is maltitol's effect on blood sugar levels far from "minimal," as Atkins contends, there is evidence suggesting that its effect is _even greater_ than that of regular sugar. The Center for Science in the Public Interest wrote to the FDA:

[T]he labels on a number of foods state that maltitol has a minimal impact on blood sugar. Some studies suggest that maltitol raises blood sugar less than sucrose.

---

[33] Ibid., pg. 360.
[34] http://www.nytimes.com/learning/students/pop/20040415snapthursday.html (last viewed 06/12/17)
[35] http://www.wsj.com/articles/SB109700319191636814 (last viewed 06/12/17)

However, in other studies, maltitol has a glycemic index of 73, which is higher than that of sucrose (61).[36]

**The "Glycemic Impact" Obfuscation**

51.    While knowing the scientific truth, Atkins has engaged in a calculated campaign to sow scientific confusion in the public mind in order to conceal its Net Carbs Deception and further perpetuate its fraud on consumers.  It has attempted to as it were "change the subject" from the glycemic index of sugar alcohols—and especially maltitol and maltitol syrup—to the issue of the "glycemic impact" of its products taken as a whole, which is altogether distinct from, and irrelevant to the truth or falsity of, its Net Carbs representations.

52.    The Atkins website explains:

"Atkins Advantage nutrition bars and shakes are low-glycemic impact.  A patent-pending clinical testing method substantiates the low glycemic impact and confirm [sic] the accuracy of the Atkins net carb labeling claims."[37]

This emphasis on "glycemic impact" is also found in Atkins representative Aliza Rothman's response to Dr. Eenfeldt's criticisms of Atkins's Net Carb representations (quoted above):

I also would like to provide you with correct information about Atkins products. Atkins products have been clinically tested for blood sugar responses using the glycemic load methodology; (http://www.nutritionandmetabolism.com/content/3/1/33). We take pride in offering our customers products that have a minimal glycemic impact. There are simply some consumers who need a low sugar alternative to high sugar habits for better compliance.[38]

53.    That Atkins requires a "patent-pending clinical testing method" to substantiate its claims is just one more data point in its pattern of deception, since truly scientific experiments can be reproduced by other researchers who will either confirm or falsify their results without

---

[36] http://www.fda.gov/ohrms/dockets/dailys/04/july04/071604/04p-0297-cp00001-01-vol1.pdf (last viewed 06/12/17)

[37] https://www.atkins.com/how-it-works/library/articles/the-low-glycemic-approach-to-healthy-eating (last viewed 06/12/17)

[38] http://www.dietdoctor.com/atkins-greed-and-the-fairy-tale-cookies (last viewed 06/12/17)

becoming liable for patent infringement.  Real science does not require special, proprietary methods to prove its claims.  Atkins science is mere pseudo-science, an alternative science that ignores indisputable facts about the glycemic index of maltitol and maltitol syrup in order to promote the alternative glycemic reality communicated by Atkins labels.

54.    This need to deny reality is why Atkins assures consumers that it employs a "glycemic load methodology" to ensure that its products have a "low glycemic impact."  This is a red herring because "glycemic load" and "low glycemic impact" are *relative* concepts that describe the glycemic effect of certain foods by comparison with others.  So an Atkins bar may indeed have a low glycemic impact relative to a big bowl of pasta or a few slices of pizza.  But this has nothing to do with Atkins's Net Carbs representations, which concern *the glycemic effect of the grams of sugar alcohols in Atkins products*.  Atkins's Net Carbs counts represent that this effect is approximately zero when the truth is that it is very far from zero where maltitol and maltitol syrup are concerned.

55.    The fact that carb-conscious consumers might still be better off eating an Atkins bar than a bowl of pasta or a subway sandwich does nothing to eliminate this basic deception.  Consumers weighing whether to purchase Atkins bars are comparing their carbohydrate content to that of other snack foods or competing energy bars, not to the total carbohydrate content of full meals.  So, the fact that the Products can be said to have a "low glycemic impact" relative to some other products on supermarket shelves is simply irrelevant.

56.    The Glycemic Impact Obfuscation was repeated in Atkins's response to David Mendosa's criticisms (quoted above).  Colette Heimowitz, Vice President of Education and Research at Atkins Health and Medical Information Services, retorted:

It is "misleading to compare the quantity of sugar alcohol tested to determine the glycemic index with the quantity of sugar alcohol that is actually in our products" because the "glycemic index does not take into account serving size."[39]

This last claim, that the glycemic index does not measure serving size, is of course true. But it has nothing to do with the question of whether Atkins is misleading consumers when it *treats the glycemic index of maltitol and maltitol-syrup-derived carbohydrates as though it was zero when it is very far from zero*. This is exactly what Atkins is doing when it issues its Net Carbs representations, which tell consumers that the glycemic effects of its maltitol and maltitol-syrup sugar alcohols can be discounted as readily as those of fiber. The fact that the glycemic index is not an all-encompassing measurement of everything a health-conscious consumer might wish to know about a food does nothing to exonerate Atkins of this fundamental fraud.

57.    Heimowitz also argued that Mendosa's article did "not consider that other components in the product [besides sugar alcohol] such as fat, fiber and protein will have an impact on the metabolism of the sugar alcohol and, thus, the blood sugar response."[40]  But Atkins's Net Carb claims have nothing to do with the Products' fat and protein content. Of course, the glycemic index is a scientific abstraction whose real-world significance for individuals is always going to be affected by the total nutritional context. But this holds true of *any* carbohydrate in *any* food and does justify Atkins in lying about its particular carbohydrates.

58.    The truth is that Atkins has long been aware of its deceptive practices and conduct. For a period of time beginning around 2004 or 2005, Atkins announced its intent to abandon the use of Net Carb claims and replaced these with "net Atkins count" claims, which were supposedly based on actual scientific testing rather than a strict mathematical formula—as is now once again

---

[39] http://www.mendosa.com/netcarbs.htm
[40] http://www.mendosa.com/netcarbs.htm (last viewed 06/12/17)

endorsed by Atkins.  At that time, Atkins described its former Net Carbs claims as "imprecise,"[41]

which is a major understatement but marginally more honest than is now the norm at Atkins.  The

*Wall Street Journal* reported in 2004:

> Under the old method, the Atkins Endulge chocolate almond bar had two grams of
> "net carbs," according to the label.  Under the "net Atkins count" method, the candy
> bar would come out with more than twice that amount.  Atkins says it is
> discontinuing the product.

> Products most likely to flunk Atkins's new carb-testing method are those
> containing a lot of sugar alcohols, such as candies and other sweets.  Products with
> high fiber levels would be less likely to show such a discrepancy, Atkins says.[42]

59.    But Atkins discovered that candies and sweets sell, especially when consumers can

be persuaded that they are actually health foods.  And this is why Atkins has reverted to its old

ways, treating the most glycemic of its sugar alcohols as though they were non-existent in order to

deceive consumers and line its pockets.

**Defendant's Net Carbs Claims Violate Identical State And Federal Laws**

60.    Food manufacturers must comply with federal and state laws and regulations

governing the labeling of food products.  Defendant's false and deceptive labeling is misleading

and in violation of FDA and consumer protection laws of each of the fifty states and the District

of Columbia.

61.    The FDCA provides that "[a] food shall be deemed misbranded – (a) (1) its labeling

is false or misleading in any particular, or 21 U.S.C. §§ 343 (a)(1).  Under the FDCA, the term

"false" has its usual meaning of "untruthful," while the term "misleading" is a term of art.

Misbranding reaches not only false claims, but also those claims that might be technically true,

although still misleading. If anyone representation in the labeling is misleading, the entire food is

---

[41] http://www.wsj.com/articles/SB109700319191636814 (last viewed 06/12/17)
[42] http://www.wsj.com/articles/SB109700319191636814 (last viewed 06/12/17)

misbranded. No other statement in the labeling cures a misleading statement. "Misleading" is judged in reference to "the ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze." *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951). Under the FDCA, it is not necessary to prove that anyone was actually misled.

62.    While the FDA has not established regulations for the use or calculation of Net Carb claims, it has recognized that the substitution of sugar alcohols for sugar in a product cannot justify the suggestion that the product is low in carbohydrates—even when the nutrition facts panel accurately discloses the total carbohydrates in the product (as do the nutrition panels on Atkins® products). Denying a petition to brand certain food products "Carbolite," the FDA explained:

> [S]everal of the Carbolite® brand product labels that were submitted with the petition indicate that these products contain the same or substantially similar amounts of carbohydrates as similar products that do not substitute sugar alcohols for sugars ("comparable reference products") … Use of the term "Carbolite" on products in which there is no reduction in carbohydrates compared to a similar product is not only inherently misleading, but is not truthful.[43]

63.    New York and federal law have placed similar requirements on food companies that are designed to ensure that the claims companies are making about their products to consumers are truthful and accurate. Defendant's packaging and advertising of the Products also violate various state laws against misbranding which mirror federal law. New York and other state law broadly prohibit the misbranding of food in language identical to that found in regulations promulgated pursuant to the FDCA, 21 U.S.C. §§ 343 et seq.

64.    N.Y. Agm. Law § 201 states that "[f]ood shall be deemed to be misbranded: 1. If its labeling is false or misleading in any particular…" New York State law broadly prohibits the misbranding of food in language identical to that found in regulations promulgated pursuant to the

---

[43] http://www.fda.gov/ohrms/dockets/dockets/02p0462/02p-0462-pdn0001-01-vol1.pdf (last viewed 06/12/17)

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*: Pursuant to N.Y. State Education Law § 6815, "[f]ood shall be deemed to be misbranded: 1. If its labeling is false or misleading in any particular…"  Defendant's Products were misbranded under New York law because they misled Plaintiff and Class members about the nature of the Products.

**Defendant's Misrepresentations Mislead, And Are Relied Upon By, Reasonable Consumers**

65.  Defendant's Net Carbs representations are deceptive and likely to mislead a reasonable consumer, who cannot distinguish between Atkins Products and food that is genuinely low in carbohydrates.  The FDA consumer behavior survey referenced above also discovered:

> Respondents who saw only the *front panel* often perceived different claims that implied "low in carbohydrate" as having a shared meaning. Respondents often rated products similarly whether they had "Low Carb," "CarbConscious," or "Net Carb" on the front.[44]

66.  A representation that a product has a particular number of "Net Carbs" is material to a reasonable consumer when deciding to purchase a product, as proven by the popularity of low-carb diets and the fact that Atkins's Net Carb concept is a central feature of its marketing strategy.

67.  Defendant's deceptive labeling and other misleading representations were a material factor in Plaintiff's and Class members' decisions to purchase the Products. Relying on these misrepresentations, Plaintiff and Class members believed they were purchasing Products whose sugar alcohol carbohydrates have a minimal glycemic effect.

68.  Defendant's Product labeling as alleged herein is deceptive and misleading and was designed to increase sales of the Products.  Defendant's misrepresentations are part of its systematic practice of mislabeling its Products.

69.  At the point of sale, Plaintiff and Class members did not know, and had no reason to know, that the Products were misbranded as set forth herein, and would not have bought the

---

[44] http://www.fda.gov/food/foodscienceresearch/consumerbehaviorresearch/ucm168989.htm

Products had they known the truth about them.  Defendant knew and intended that its Net Carbs

misrepresentations would be relied upon.  As a result of Defendant's misrepresentations, Plaintiff

and thousands of others throughout the United States purchased the Products.

**Plaintiff and The Class Were Injured as The Result of Defendant's Deceptive Practices**

70.    Plaintiff and the Class (defined below) were injured by Defendant's deceptive and

unfair conduct when they were denied the benefit of their bargain and paid premium prices they

otherwise would not have paid over other comparable products that did make deceptive "Net Carb"

claims.

71.    Plaintiff paid $12.08 for a single 6.0 oz. box of Defendant's Peanut Butter Cups after

Defendant induced in her the belief that the Atkins candy was significantly healthier, because

significantly less glycemic, than other candies.  Defendant warranted that Plaintiff was receiving

a minimally glycemic product but delivered a significantly glycemic one, which had much less

value for Plaintiff.

72.    The table below compares the nutrients and economics of the Atkins® *Endulge*®

Chocolate Peanut Candies against another product that looks and is very similar but has not

participated in the Net Carbs Fraud:

| | Atkins® *Endulge*® Chocolate Peanut Candies | M&M's® Peanut |
|---|---|---|
| Calories Per Gram of Product | 4.41 | 5.07 |
| Grams of Fat Per Gram of Product | 0.32 | 0.26 |
| Grams of Carbohydrates Per Gram of Product | 0.53 | 0.61 |
| Price Per Gram of Product | 5.20¢ (based on $8.99 purchase of 170g box at Duane Reade) | 1.76¢ (based on $5.29 purchase of 299g pack at Duane Reade) |

This comparison shows that there is very little nutritional difference between Defendant's

Chocolate Peanut Candies and the "junk food" upon which it is obviously modeled.  The Atkins

Product has slightly fewer calories and carbohydrates per gram while M&M's have slightly less fat. The economics of the two candies are very different, however. While M&Ms can charge consumers only 1.76¢ per gram, Atkins can get away with charging 295% of that, nearly three times more. The reason is Atkins's deceptive "1g Net Carb' representation. Though a gram of Defendant's Product contains 87% of the amount of carbohydrates in a gram of M&Ms, the Net Carbs fraud has allowed it to pass off its Product as some kind of health food, and to accordingly charge a premium price.

73. One discovers the same phenomenon when one compares the Product purchased by Plaintiff GARCIA with the well-known junk foods upon which it was obviously modeled:

|  | Atkins® *Endulge*® Peanut Butter Cups | Reese's Peanut Butter Cups | Nestle Butter Fingers Peanut Butter Cups |
|---|---|---|---|
| Calories Per Gram | 4.71 | 5.14 | 5.48 |
| Grams of Fat Per Gram of Product | 0.38 | 0.29 | 0.33 |
| Grams of Carbohydrates Per Gram of Product | 0.53 | 0.57 | 0.57 |
| Price Per Gram | 5.20¢ (based on $8.99 purchase of 170g box at Duane Reade) | 1.44¢ (based on a $4.29 purchase of a 297g pack at Duane Reade) | 1.68¢ (based on a $4.99 purchase of a 297.6g pack at Duane Reade) |

Once again, there is very little nutritional difference between Defendant's Product and its "junk food" competitors. Defendant's peanut butter cups have slightly fewer calories and carbohydrates per gram while its competitors' have slightly less fat. Here too, however, the economics of the candies could not be more different, as Atkins can charge 361% and 310% of the prices charged by its competitors. The explanation lies in the Atkins® Product's deceptive "2g Net Carb" representation. Though a gram of the Atkins® Product contains a full 93% of the amount of

carbohydrates in a gram of its competitor products, the Net Carbs fraud has permitted it to pass off its own peanut butter cups as some kind of health food, and to accordingly charge a premium price.

## CLASS ACTION ALLEGATIONS

74.    Plaintiff GARCIA brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class:

> All persons or entities in the United States who made retail purchases of the Products during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Nationwide Class").

In the alternative, Plaintiff GARCIA seeks to represent

> All persons who made retail purchases of the Products in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the New York Class").

The proposed Classes exclude current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

75.    Plaintiff reserves the right to revise the Class definition based on facts learned in the course of litigating this matter.

76.    This action is proper for class treatment under Rules 23(b)(1)(B) and 23(b)(3) of the Federal Rules of Civil Procedure. While the exact number and identities of other Class members are unknown to Plaintiff at this time, Plaintiff is informed and believes that there are thousands of Class members. Thus, the Class is so numerous that individual joinder of all Class members is impracticable.

77.    Common questions of law and fact arise from Defendant's conduct described herein. Such questions are common to all Class members and predominate over any questions affecting only individual Class members and include:

a.    Whether the Products' "Net Carbs" claims are false and misleading;

b.    whether Defendant engaged in a marketing practice intended to deceive consumers about the glycemic significance of its sugar alcohols;

c.    whether Defendant deprived Plaintiff and the Class of the benefit of their bargain because the Products they purchased were different from, and had less value than, what was represented by Defendant;

d.    whether Defendant must disgorge any and all profits they have made as a result of its misconduct; and

e.    whether Defendant should be barred from discounting maltitol- and maltitol syrup-derived carbohydrates in its "Net Carbs" calculations.

78.    Plaintiff's claims are typical of those of Class members because Plaintiff and other Class members sustained damages arising out of the same wrongful conduct, as detailed herein. Plaintiff purchased Defendant's Product and sustained similar injuries arising out of Defendant's conduct in violation of New York State law. Defendant's unlawful, unfair and fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. The injuries of the Class were caused directly by Defendant's wrongful misconduct. In addition, the factual underpinning of Defendant's misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all Class members. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of other Class members and are based on the same legal theories.

79.    Plaintiff will fairly and adequately represent and pursue the interests of the Class and have retained competent counsel experienced in prosecuting nationwide class actions. Plaintiff understands the nature of her claims herein, has no disqualifying conditions, and will vigorously

represent the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class. Plaintiff has retained highly competent and experienced class action attorneys to represent their interests and those of the Class. Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

80.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

81.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

82.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

83.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.

84.    Defendant's conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

## CAUSES OF ACTION

### COUNT I

**INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

**(brought on behalf of the Nationwide Class in conjunction with substantively similar consumer protection laws of other states and the District of Columbia to the extent New York law does not reach the claims of out-of-state Class members or, alternatively, on behalf of the New York Class)**

85.    Plaintiff GARCIA realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

86.    Plaintiff GARCIA brings this claim on behalf of herself and the other members of the Class for an injunction for violations of New York's Deceptive Acts or Practices Law ("NY GBL § 349").

87.    NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

88.    Under the § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 … claims, it was error. Justifiable reliance by the plaintiff is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

89.    Any person who has been injured by reason of any violation of the NY GBL may bring an action in their own name to enjoin such unlawful act or practice, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the Defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

90.    The practices employed by Defendant, whereby Defendant advertised, promoted, and marketed its Products and their "Net Carbs" were unfair, deceptive, and misleading and are in violation of the NY GBL § 349.

91.    The foregoing deceptive acts and practices were directed at customers.

92.    Defendant should be enjoined from discounting maltitol- and maltitol-syrup-derived carbohydrates in its "Net Carbs" representations as described above.

93.    Plaintiff GARCIA, on behalf of herself and all others similarly situated, respectfully demands a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## COUNT II

### INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

**(brought on behalf of the Nationwide Class in conjunction with substantively similar consumer protection laws of other states and the District of Columbia to the extent New York law does not reach the claims of out-of-state Class members or, alternatively, on behalf of the New York Class)**

94.    Plaintiff GARCIA realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

95.    Plaintiff GARCIA brings this claim individually and on behalf of the other members of the Class for violations of NY GBL § 349.

96.    Defendant's conduct and/or omissions as alleged herein constitute deceptive acts or practices under NY GBL § 349, which was enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

97.    The practices of Defendant described throughout this Complaint, were specifically directed to consumers and violate NY GBL § 349 for, *inter alia*, the following reasons:

a.    Defendant engaged in deceptive, unfair and unconscionable commercial practices in failing to reveal material facts and information about the Products, which did, or tended to, mislead Plaintiff and the Class about facts that could not reasonably be known by them;

b.    Defendant knowingly and falsely represented and advertised a deceptive "Net Carb" count with an intent to cause Plaintiff and Class members to underestimate the glycemic effect of the Products;

c.    Defendant caused Plaintiff and the Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct.

98.    The practices employed by Defendant, whereby Defendant advertised, promoted, and marketed its Products and their "Net Carbs" counts were unfair, deceptive, and misleading and are in violation of NY GBL § 349.

99.    Under the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

100.    Defendant's deceptive acts, omissions and practices were directed at consumers. Defendant's actions impact the public interest because Plaintiff and members of the Class were injured in exactly the same way as thousands of others purchasing the Products.

101.  By committing the acts alleged in this Complaint, Defendant has misled Plaintiff and the Class into purchasing the Products, in part or in whole, due to an erroneous belief about the Products' content.  This is a deceptive business practice that violates NY GBL § 349.

102.  Defendant's "Net Carbs" claims misled Plaintiff and are likely in the future to mislead reasonable consumers. Had Plaintiff and Class members known the true facts about the Products, they would not have purchased them at the given price.

103.  The foregoing deceptive acts, omissions and practices set forth in connection with Defendant's violations of NY GBL § 349 proximately caused Plaintiff and other members of the Class to suffer damages in the form of, *inter alia*, monies spent to purchase the Products and the ingestion of carbohydrates that were more glycemic than was warranted to them. Plaintiff and other members of the Class are entitled to recover such damages, together with statutory damages, equitable and declaratory relief, appropriate damages, including punitive damages, attorneys' fees and costs.

## COUNT III

### DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (FALSE ADVERTISING LAW)

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection laws of other states and the District of Columbia to the extent New York law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class**

104.  Plaintiff GARCIA realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

105.  Plaintiff GARCIA brings this claim individually, as well as on behalf of members of the Class, for violations of NY GBL § 350.

106.  Defendant has been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

107.  New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

108.  Defendant caused to be made or disseminated throughout New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers and the Class.

109.  Defendant's Net Carbs misrepresentations as alleged herein were material and substantially uniform in content, presentation, and impact upon consumers at large.

110.  Defendant has violated N.Y. Gen. Bus. Law § 350 because its Net Carbs misrepresentations were material and likely to deceive a reasonable consumer.

111.  Plaintiff GARCIA and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising.

112.  Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff GARCIA and members of the Class seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a (1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## COUNT IV

## BREACH OF EXPRESS WARRANTIES

**(brought on behalf of the Nationwide Class in conjunction with the express warranty laws of the other states and the District of Columbia to the extent New York law is inapplicable to out-of-state Class members, or, alternatively, on behalf of the New York Class)**

113.  Plaintiff GARCIA realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

114.  Defendant provided Plaintiff GARCIA and other members of the Class with written express warranties, including, but not limited to, warranties that the Products contain only minimally glycemic sugar alcohols. The "Net Carbs" claims made by Defendant are an affirmation of fact—that the discounted carbohydrates have a "minimal" impact on blood sugar.  This affirmation of fact became part of the basis of the bargain and created an express warranty that the good would conform to the stated promise. Plaintiff and Class members placed importance on Defendant's claims.

115.  Defendant breached the terms of its express warranty to Plaintiff and the Class by not providing Products with the qualities promised.

116.  As a proximate result of Defendant's breach of warranties, Plaintiff and Class members suffered damages in an amount to be determined by the Court and/or jury, in that they purchased and paid for products that did not conform to what Defendant promised in its promotion, marketing, advertising, packaging and labeling.  They were deprived of the benefit of their bargain and spent money on products that did not have any value or had less value than was warranted.

## COUNT V

## COMMON LAW FRAUD

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

117. Plaintiff GARCIA realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

118. Defendant intentionally made materially false and misleading claims through its "Net Carb" representations, intending that Plaintiff and the Class rely on them.

119. Plaintiff and Class members reasonably relied on Defendant's false and misleading representations and omissions. They did not know, and had no reason to know, the truth about the Products at the time they purchased them. They would not have purchased the Products had they known the truth—viz., that Defendant's Net Carbs claims understate the glycemic effect of the sugar alcohols in the Products.

120. Plaintiff and members of the Class have been injured as a result of Defendant's fraudulent conduct and must be compensated in an amount to be determined at trial.

## COUNT VI

## NEGLIGENT MISREPRESENTATION

**(brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

121. Plaintiff GARCIA realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

122. Plaintiff GARCIA brings this claim individually, as well as on behalf of members of the Class, for negligent misrepresentation.

123.  To state a claim for negligent misrepresentation, a plaintiff must allege that "(1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied upon the information." *Amos v. Biogen Idec, Inc*., No. 13-CV-6375T, 2014 WL 2882104, at \*5 (W.D.N.Y. June 25, 2014).

124.  Element #1 is satisfied because Plaintiff GARCIA and Atkins stood in a special relationship imposing a duty of care on Defendant.

125.  To determine the existence of a "special relationship" in a commercial transaction, a court examines three factors: "'whether the person making the representation held or appeared to hold a unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.'" *Hughes v. Ester C Co*., 930 F. Supp. 2d 439, 474–75 (E.D.N.Y 2013).

126.  Defendant holds itself out as possessing special scientific expertise in the subject of dieting, with knowledge of human physiology and the impact of different foods on it.  This expertise is presupposed in nearly all of its website articles promoting the Atkins dieting approach. In fact, an entire section of Defendant's website is devoted to disseminating what purports to be scientific information.[45]

127.  A special relationship of trust exists between Atkins and consumers.  Atkins is recommending which foods consumers should and should not be putting into their bodies, instructing them about what is required to achieve their health and weight loss goals. Consumers

---

[45] https://www.atkins.com/how-it-works/library/articles/scientific-research

trust that this advice is accurate and that Atkins will not use its claims to scientific authority to augment its profits at the expense of consumers' health.

128. Element #2 is satisfied because Defendants, directly or through its agents and employees, negligently represented to Plaintiff and the Class that it maltitol- and maltitol syrup-derived carbohydrates would only minimally impact their blood sugar levels.

129. Element #3 is satisfied because Plaintiff GARCIA and Class members reasonably relied upon Defendant's misrepresentations when purchasing the Products.

130. As a result of Defendant's negligent misrepresentation, Plaintiff GARCIA and Class members have suffered and continue to suffer economic loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated, seeks judgment against Defendant, as follows:

a. An Order that this action be maintained as a class action and appointing Plaintiff as representative of the Nationwide Class or, in the alternative, the New York Class;

b. An Order appointing the undersigned attorney as class counsel in this action;

c. Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d. All recoverable compensatory and other damages sustained by Plaintiff and the Class;

e. Actual and/or statutory damages for injuries suffered by Plaintiff and the Class and in the maximum amount permitted by applicable law;

f. An order (i) requiring Defendant to immediately cease its wrongful conduct as set forth in this Complaint; (ii) enjoining Defendant from continuing to misrepresent and

conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; (iii) ordering Defendant to engage in a corrective advertising campaign; and (iv) requiring Defendant to reimburse Plaintiff and all members of the Class in an amount up to the purchase price of the Products;

g.  Statutory pre-judgment and post-judgment interest on any amounts;

h.  Payment of reasonable attorneys' fees and costs; and

i.  Such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of herself and all others similarly situated, demands a trial by jury on all questions of fact raised by the Complaint.

Dated: July 11, 2017

Respectfully submitted,

By: ____/s/ C.K. Lee_____
        C.K. Lee, Esq.


**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*